Entered: August 8th, 2020
Signed: August 8th, 2020

**SO ORDERED**



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| RailWorks Corporation, et al., | * | Case Nos.    01-64463-MMH through |
| | * | 01-64485-MMH |
| | * | (Jointly Administered under |
| | * | Case No. 01-64463-MMH) |
| Debtors. | * | |
| | * | Chapter 11 |
| * * * * * * | * | * * * * * * |
| L.K. Comstock & Company, Inc., | * | |
| | * | Adversary No. 19-00199-MMH |
| Plaintiff, | * | |
| vs. | * | |
| | * | |
| Irene Reibie, et al., | * | |
| | * | |
| Defendants. | * | |
| * * * * * * | * | * * * * * * |

### _AMENDED_* MEMORANDUM OPINION

A chapter 11 reorganization involves a complex balancing of the rights of the business debtor and those of the debtor's various creditors. Rarely does any one party come out a clear winner. Rather, each party sacrifices something in the process, and some parties sacrifice more than others. The facts before the Court demonstrate this often-harsh reality.

---

* The Court files this Amended Memorandum Opinion solely to clarify one fact in the record, which is described at note 17 and the accompanying text.

The Plaintiff in this adversary proceeding successfully reorganized its business under chapter 11 of the U.S. Bankruptcy Code.[1] Through that process, the Plaintiff worked to identify all parties potentially holding claims against it. The Plaintiff then sought to address those claims under the terms of its confirmed plan of reorganization and the discharge provisions of the Code. The Order confirming the Plaintiff's plan of reorganization included standard language implementing the discharge provisions of sections 524 and 1141 of the Code, thereby discharging the Plaintiff's liability on prepetition claims (except for the Plaintiff's obligations under the plan).

Approximately 16 years after the confirmation of the Plaintiff's plan, the Defendants filed state court litigation against the Plaintiff and others for injuries allegedly sustained from exposure to asbestos between 8 and 27 years prior to the filing of the Plaintiff's bankruptcy case. As with many personal injury and asbestos cases, the Defendants' alleged injuries and hardship are heart-wrenching. It is easy to understand the Defendants' desire to hold parties accountable, as well as their firmness in their factual and legal positions. Unfortunately, the law does not provide a remedy for every wrong, and Congress has made some very difficult (but necessary) policy decisions in the context of parties' rights under the Code. The relevant policy and applicable law preclude the Defendants' pursuit of their alleged claims against the Plaintiff. No aspect of this adversary proceeding, however, affects the Defendants' rights and remedies against any party other than the Plaintiff.

As more fully explained below, based on the undisputed material facts, the Court concludes that the Defendants' alleged claims against the Plaintiff were prepetition "claims" under section 101 of the Code.[2] The Court further determines that, despite the Plaintiff's reasonable due

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code").

[2] Section 101(5) provides the current definition of the term "claim" for purposes of the Code. Prior to the 1991/1992 version of the Code, the definition of "claim" was found in section 101(4). The definition was not amended when Congress added the definition for "assisted person" in the new section 101(3), which caused the renumbering of section 101, nor has it been substantively amended since.

diligence during its claims identification process, the Defendants were unknown creditors at the time of the Plaintiff's chapter 11 case. Consequently, the publication notice of the claims bar date in the Plaintiff's chapter 11 case, which was approved by the Court, satisfied the notice and due process requirements of the Code, the U.S. Constitution, and the Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). The Court underscores that this result is supported by the Plaintiff's actions in its bankruptcy case, what was reasonable and practicable for the Plaintiff to undertake at that time, and the delicate balancing tests underlying both the Code and the Supreme Court's approach to notice and due process in *Mullane*.

The Court also notes that it does not render this decision lightly. The Court fully appreciates that the result likely seems harsh and unfair to the Defendants. The Court cannot, however, analyze the dispute solely through the Defendants' lens and must consider all relevant facts, circumstances, and applicable law. Both the chapter 11 claims process and constitutional due process considerations are meant to provide notice and an opportunity to be heard to all affected parties with "due regard for the practicalities and peculiarities" of the case at hand. *Mullane*, 339 U.S. at 314. When, as here, a chapter 11 debtor has done all that it could reasonably do to identify and provide notice to potential creditors, the debtor has satisfied its obligations and is entitled to the finality and fresh start offered by the Code.

## I.     Relevant Background

L.K. Comstock & Company, Inc. (the "Plaintiff"), RailWorks Corporation (the Plaintiff's parent company), and 20 of their affiliates filed for protection under chapter 11 of the Code on September 20, 2001 (collectively with the Plaintiff, the "Debtors"). The Debtors continued to operate their respective businesses as debtors and debtors in possession during the pendency of the chapter 11 cases. Much of what transpired during the chapter 11 cases is irrelevant to this matter, other than perhaps the claims administration and plan confirmation processes. To that end, the

Debtors established a bar date and a supplemental bar date for the filing of proofs of claim by all holders of claims against or interests in any of the Debtors (collectively, the "Bar Date"), and the Court ultimately confirmed the Plan (the "Confirmation Order"). Case No. 01-64463, ECF 336, 570, 1274; *see also* Case No. 19-00199, Pl. Memo. ECF 13, Ex. A ¶¶ 11–20; *id.* Ex. C. The Plan became effective on November 13, 2002 (the "Effective Date"). *Id.*, Case No. 01-64463, ECF 1361; *see also* Case No. 19-00199, Pl. Memo. ECF 13, Ex. A ¶ 20. Among other things, the Plan releases and enjoins all claims that were or could have been filed against the Debtors and resolved in the context of the claims administration process.

The Defendants are individuals who allegedly were exposed to asbestos at various work sites and, in some instances, those individuals' spouse. Defendant Ronald Reibie worked as an electrician for, among others, a predecessor of the Plaintiff from 1954 to 1974. ECF 1 ¶¶ 26–33. Defendant Daniel Harrity was employed by various employers from 1955 to 1983. *Id.* ¶¶ 34–41. Defendant Robert Sage was employed by various employers from 1963 to 1993. *Id.* ¶¶ 42–51. Each of these Defendants (or their representatives) allege that they were exposed to, and did inhale, asbestos dust and asbestos fibers during their employment, which caused them harm. The Plaintiff denies being the cause of the Defendants' injuries.

 In 2018 and 2019, approximately 16 years after the Effective Date, the Defendants filed separate litigation against the Plaintiff and others (collectively, the "state court defendants") in Pennsylvania state court (the "state court litigation"). The Defendants assert numerous claims against the state court defendants and allege that those parties are liable for damages relating to the Defendants' respective cancer diagnoses and losses stemming from asbestos exposure.[3] The Plaintiff subsequently moved to reopen its chapter 11 case and filed this adversary proceeding.

---

[3] Defendant Irene Reibie and Defendant Judith Sage assert claims and damages stemming from their spouses alleged diagnoses and exposure.

Case No. 01-64463, ECF 3123, 3135. The Court then entered an Order staying the state court litigation solely as to the Plaintiff. *Id.*, ECF 3136.

The matter before the Court involves the parties' cross-motions for summary judgment. Case No. 19-00199, ECF 10, 12. In connection with the pending motions, the parties disclosed that certain of the Defendants have dismissed with prejudice their state law actions against the Plaintiff, rendering moot Counts II and III of the Plaintiff's Complaint. *See, e.g.,* ECF 10. The motions and, in turn, the relief granted by this Order address solely Count I of the Plaintiff's Complaint and the alleged claims of Mr. and Mrs. Reibie (the "Reibie Defendants").[4] The Court has reviewed the motions, legal memoranda, and supporting documentation. For the reasons set forth below, the Court will grant the Plaintiff's motion for summary judgment and deny the Defendants' motion for summary judgment, other than with respect to the requested sanctions.

## II.     Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This proceeding is a "core proceeding" under 28 U.S.C. § 157(b)(2). Although these simple statutory references often suffice to establish the Court's jurisdiction in an adversary proceeding, the Court offers additional explanation given the status of the Debtors' chapter 11 cases.

### A.  Bankruptcy Court Jurisdiction

The confirmation of a chapter 11 plan often starts the winding down process in a chapter 11 case. Upon the plan's effective date, the debtor emerges as a "reorganized entity," most of its

---

[4] The Plaintiff's Motion for Summary Judgment seeks sanctions against all Defendants (set forth in Counts IV–VI of the Complaint); nevertheless, the Court does not address the sanctions request in this Order and will, if necessary, render a decision on that issue as to all Defendants at a subsequent time. No party should read anything into the deferral of a ruling on the sanctions request to a later date, as the Court foreshadowed this approach at the January 9, 2020, hearing on the pending motions.

property and business operations revest in it, and the reorganized debtor is allowed to go about its business without the oversight and intervention of the bankruptcy court, other than as provided in the confirmed plan. Indeed, one of the primary objectives of the Code is to facilitate this kind of rehabilitation and give the reorganized debtor a "fresh start" and new chance at successful business operations.

Another key objective of the Code is to maximize value—and provide fair and equal treatment—for creditors. Thus, the confirmed plan acts in many ways as a new contract between the reorganized debtor and its creditors. The confirmed plan further details the treatment of creditors and interest holders and implements safeguards for both the reorganized debtor and its creditors to ensure the implementation of the Plan's terms and the Code's policies.

As a result, confirmed plans, like the Plan, frequently include retention of jurisdiction provisions. These provisions clarify and explain the scope of the bankruptcy court's postconfirmation jurisdiction over matters involving the reorganized debtor, the estate, and creditors. For example, section 12 of the Plan provides that the Court retains jurisdiction to, among other things,

> "(b) determine any motion, adversary proceeding, avoidance action, application, contested matter pending or commenced after the Confirmation Date"; …
>
> "(f) issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan of Reorganization, the Confirmation order, or any other order of the Bankruptcy Court"; …and
>
> "(k) take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of the Plan following consummation."

Case No. 01-64463, ECF 1095. Thus, under the terms of the Plan, the Court can interpret the Plan and the Confirmation Order, issue injunctions and similar relief to ensure compliance with its

6

Confirmation Order, and determine whether any actions are in violation of the Plan, the Confirmation Order, or the Code.

Notably, however, neither the Plan nor the Confirmation Order can expand the jurisdiction of this Court. The Court also must have jurisdiction over the matter. Most courts, including those in the Fourth Circuit, apply the "close nexus" test to determine if a bankruptcy court has "related to" jurisdiction in the postconfirmation setting. *See Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 837 (4th Cir. 2007) ("We find the Third Circuit's 'close nexus' requirement to be a logical corollary of 'related to' jurisdiction. Analytically, it insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction."); *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004) ("The question is how close a connection warrants post-confirmation bankruptcy jurisdiction. Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus. Under those circumstances, bankruptcy court jurisdiction would not raise the specter of 'unending jurisdiction' over continuing trusts."); *see also In re Lehman Bros. Holdings Inc.*, No. 08-13555, 2018 WL 3869606, at *6 (Bankr. S.D.N.Y. Aug. 13, 2018), *leave to appeal denied,* No. 18-CV-8986-VEC, 2019 WL 2023723 (S.D.N.Y. May 8, 2019).

The Court understands its obligation to thoroughly consider and to cautiously invoke its postconfirmation jurisdiction. The close nexus test encourages this approach and guides any such analysis. Under that test, the questions posed by this adversary proceeding fall squarely within the Court's postconfirmation jurisdiction. Regardless of how the issues are framed, the resolution of this matter turns on the Court's interpretation of the Plan and the Confirmation Order and its application of federal case law defining "claims" under section 101 of the Code, as well as the scope of the discharge injunction under sections 524 and 1141 of the Code. It involves primarily

questions of federal bankruptcy law, and it has potential implications for the Debtors and any party who held or may hold a claim or interest subject to the Plan. The Court thus concludes that the exercise of jurisdiction over this proceeding is appropriate under the applicable statutes and case law.

### B.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7056, governs the pending motions. A moving party may be entitled to judgment as a matter of law under Civil Rule 56 in the absence of any genuine issue of material fact. Fed. R. Civ. P. 56. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4thCir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)); *see also Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing standards for summary judgment). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett*, 532 F.3d at 297. Courts generally will grant summary judgment "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Stanley Martin Cos. v. Universal Forest Prods. Schoffner LLC*, 396 F.Supp.2d 606, 614 (D. Md. 2005) (citations omitted).

A court must view the evidence on summary judgment in the light most favorable to the nonmoving party and "draw all justifiable inferences" in its favor, "including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (citations omitted). Under Civil Rule 56, a party may support assertions made in a motion for summary judgment by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. Fed. R. Civ. P. 56(c). A court has some flexibility in the kinds of evidence that it can consider in resolving a

motion for summary judgment. *See, e.g., Humphreys & Partners Architects*, 790 F.3d 532, 538–539 (4th Cir. 2015).

In this proceeding, the parties rely primarily on papers filed in the Debtors' chapter 11 cases or associated with the state court litigation, as well as affidavits supporting their respective positions. The parties also do not dispute certain key material facts, including when Mr. Reibie worked as an electrician and allegedly was exposed to asbestos, when Mr. Reibie was diagnosed with cancer, and that neither Reibie Defendant was listed as a creditor in the Debtor's chapter 11 cases nor received actual notice of the Bar Date. *See, e.g.,* Stipulation of Facts, ECF 13, Ex. B; Record Hrg. at 1:53 p.m. (acknowledgment of Stipulation of Facts).[5] The Court analyzes each of these undisputed facts and certain related issues in its analysis below.

## III.    Analysis

The resolution of the pending motions turns largely on one question, namely are the Reibie Defendants' claims subject to the discharge injunction imposed by the Debtors' Plan, the Confirmation Order, and sections 524 and 1141 of the Code. The parties present their respective positions as clearly warranted and easily reached under the facts of this proceeding and applicable law. The Court finds the answer, however, more nuanced and complex. The concept of a "claim" subject to the bankruptcy discharge is certainly broad and intended to facilitate a debtor's fresh start and equal distributions among creditors. But is the concept so broad as to foreclose a creditor's remedies when the extent of the creditor's injuries arguably was not readily apparent at the time of the bankruptcy? Based on the particular facts of this case, the Court finds that the concept is at least broad enough to bar the continued pursuit of the Reibie Defendants' claims against the Plaintiff.

---

[5] Citations to the hearing record in this Order refer to the January 9, 2020, hearing held on the parties' cross-motions for summary judgment in this adversary proceeding.

### A.  Definition of Claim

The concept of a "claim" in bankruptcy, although simple to state, holds critical meaning. It helps to identify the universe of parties subject to a debtor's bankruptcy case and the scope of the debts affected by the bankruptcy discharge. Debtors often file a bankruptcy case not only to obtain the benefit of the automatic stay of section 362 of the Code, which allows them to catch their financial breath, but also to reduce or eliminate their prepetition debt through the bankruptcy discharge and sections 524 and 1141 of the Code. 11 U.S.C. §§ 362(a), 524(a), 1141(d). To that end, a bankruptcy case establishes a bright line in the debtor's financial life between prepetition claims that are subject to discharge and postpetition claims that warrant different treatment. This division is central to facilitating a debtor's fresh start upon confirmation of its plan of reorganization and its emergence from bankruptcy.

Courts traditionally interpret the term "claim," as defined in section 101 of the Code, broadly. As the Fourth Circuit has explained,

> The Bankruptcy Code defines the term "claim" broadly to mean a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). By using the "broadest possible definition," the Code "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case," thereby providing the debtor the "broadest possible relief." H.R. Rep. No. 95–595, p. 309 (1977); S. Rep. No. 95–989, p. 22 (1978).

*Dubois v. Atlas Acquisitions LLC (In re Dubois)*, 834 F.3d 522, 529 (4th Cir. 2016).[6] The Code identifies various kinds of obligations that might constitute a claim under section 101, but it does not necessarily define each of those obligations independently. For example, and as relevant to

---

[6] *See also Anderson Homes, Inc. v. Stock Building Supply, LLC (In re Anderson Homes, Inc.)*, No. 09-02062-8-JRL, 2009 WL 4062166, at *3 (Bankr. E.D.N.C. Nov. 19, 2009) ("The Bankruptcy Code gives 'the "broadest possible definition" to the term "claim" in order to ensure that "all legal obligations of the debtor, no matter how remote or contingent, [would] be dealt with in the bankruptcy case."' *In re Cybermech, Inc.*, 13 F.3d 818, 821 (4th Cir.1994) (citations omitted).").

this proceeding, the Code does not define the term "contingent." Courts generally have looked to common usage to define the term. *See, e.g., Denunzio v. Ivy Holdings, Inc. (In re East Orange Gen. Hosp., Inc.)*, 587 B.R. 53, 60 (D. N.J. 2018) ("The terms 'unliquidated' and 'contingent' are not defined in the Bankruptcy Code. Black's Law Dictionary defines … 'contingent claim' as '[a] claim that has not yet accrued and is dependent on some future event that may never happen.' *Id.*") (citations omitted); *In re Marshall*, 302 B.R. 711, 715 (Bankr. D. Kan. 2003) ("The court noted that a contingent claim, as defined by Black's Law Dictionary, was a claim that had not yet accrued and was dependent upon a future event that may or may not occur."); *see also Grady*, 839 F.2d at 202 (same).

Mr. Reibie worked primarily for a predecessor of the Plaintiff approximately 27 years before the petition date in the Debtors' chapter 11 cases. Def. Memo. ECF 11, Ex. C. Reibie Aff. ¶¶ 7–11; *id.*, Ex. F at 913–915; Pl. Memo. ECF 13, Ex. A. ¶¶ 26–31. Mr. Reibie's interaction with the Plaintiff, primarily through its predecessor, certainly predated the bankruptcy and was prepetition in nature. The Reibie Defendants further allege that Mr. Reibie was exposed to, and inhaled, asbestos fibers during his employment by the Plaintiff's predecessor.[7] *See, e.g.,* Def. Memo. ECF 11, Ex. C. Reibie Aff. ¶¶ 5–8; *id.*, Ex. F at 913–915. Although the Plaintiff denies being a cause of Mr. Reibie's injuries, it appears undisputed that, if Mr. Reibie was exposed to asbestos while in the Plaintiff's employ, that exposure also occurred prepetition.

Based upon these facts, the Reibie Defendants' claims, which all relate in one way or another to Mr. Reibie's alleged asbestos exposure, are grounded in prepetition activities and conduct. The Reibie Defendants dispute this conclusion. The Court thus further scrutinizes when an alleged tort claim, such as that asserted by the Reibie Defendants, arises for purposes of the

---

[7] The Reibie Defendants appear to allege that Mr. Reibie's asbestos exposure occurred at industrial work sites he was sent to while being an employee of the Plaintiff's predecessor, among others. *See* Pl. Memo. ECF 13, Ex. C at 109.

Code. The Court also considers the Reibie Defendants' argument that, at the time of the bankruptcy case, their claims did not exist under Pennsylvania state law.

### 1.  Application of the Conduct Test to the Alleged Claims

The Code is a complex scheme that creates various federal rights for parties involved in a bankruptcy case; nevertheless, the Code strives to respect and enforce parties' state law rights to the greatest extent possible. The Supreme Court succinctly stated this general principle in the context of parties' property interests as follows: "*Unless some federal interest requires a different result*, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979) (emphasis added); *see also Grady*, 839 F.2d at 201 (explaining "that '[b]ankruptcy legislation is superimposed upon rights and obligations created by the laws of the States.'") (citations omitted). In the claims context, although state law might resolve the amount or the validity of a claim, federal bankruptcy law (and not state law) determines when a claim arises for purposes of the Code. *See, e.g., Butler v. NationsBank, N.A.*, 58 F.3d 1022, 1029 (4th Cir. 1995) ("We thus adhere to our view in *Grady* that to determine when a claim arises for bankruptcy purposes, reference is to be made to federal bankruptcy law rather than to state law.").[8]

Courts addressing contingent tort claims in bankruptcy cases have determined that the party's claim against the debtor arises "when the acts constituting the tort or breach of warranty have occurred." *Grady*, 839 F.2d at 203. The Fourth Circuit in *Grady* was not discussing the allowance or discharge of a claim in bankruptcy, but it has followed *Grady's* analysis in the claims

---

[8] *See also Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162–163 (1946) ("In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits… bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles."); *Grady*, 839 F.2d at 202 ("Congress has the undoubted power under the bankruptcy article, U.S. Const. Art. I, § 8 cl. 4, to define and classify claims against the estate of a bankrupt."); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546 (1994) ("[W]here the 'meaning of the Bankruptcy Code's text is itself clear,' its operation is unimpeded by contrary state law or prior practice.").

context. *See, e.g., Holcombe v. US Airways, Inc.*, 369 Fed. App'x 424, 428 (4th Cir. 2010) ("Although *Grady* dealt with an automatic stay, our reasoning and holding may properly be applied to discharge injunctions."). Courts taking this or a similar approach generally recognize that "for federal bankruptcy purposes, a prepetition 'claim' may well encompass a cause of action that, under state law, was not cognizable until after the bankruptcy petition was filed." *In re Johns-Mansville*, 57 B.R. 680, 690 (Bankr. S.D.N.Y. 1986).

The Reibie Defendants urge the Court to adopt reasoning similar to that used by the United States Court of Appeals for the Third Circuit. In their earlier papers, the Reibie Defendants asked the Court to follow the test articulated by the Third Circuit in *Avellino & Bienes, A Partnership v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332, 337 (3d Cir. 1984). As perhaps recognized by the Reibie Defendants, most courts (including the Third and Fourth Circuits) have rejected the *Frenville* analysis. *See, e.g., Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2019); *Grady*, 839 F.2d at 201 ("All of the cases coming to our attention which have considered the issue have declined to follow *Frenville*'s limiting definition of claim. … We likewise decline to follow *Frenville*, and our reasoning follows.") (citations omitted). As the Third Circuit explained in overruling *Frenville*,

> Irrespective of the title used, there seems to be something approaching a consensus among the courts that a prerequisite for recognizing a "claim" is that the claimant's exposure to a product giving rise to the "claim" occurred pre-petition, even though the injury manifested after the reorganization. We agree and hold that a "claim" arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment" under the Bankruptcy Code. *See* 11 U.S.C. § 101(5). Applied to the Van Brunts, it means that their claims arose sometime in 1977, the date Mary Van Brunt alleged that Grossman's product exposed her to asbestos.

*Grossman's*, 607 F.3d at 125.

In their motion for summary judgment, the Reibie Defendants argue that the Court should invoke the multi-factor test endorsed by the Third Circuit in *Grossman's*. Pl. Memo. ECF 11. The

Reibie Defendants posit that a proper application of this test supports their position. In *Grossman's*, the Third Circuit stated,

> Whether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court. In determining whether an asbestos claim has been discharged, the court may wish to consider, inter alia, the circumstances of the initial exposure to asbestos, whether and/or when the claimants were aware of their vulnerability to asbestos, whether the notice of the claims bar date came to their attention, whether the claimants were known or unknown creditors, whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties, including whether it was reasonable or possible for the debtor to establish a trust for future claimants as provided by § 524(g).

*Grossman's*, 607 F.3d at 127–28. The Third Circuit discussed these factors as part of evaluating whether a creditor's due process rights would be violated by a discharge of its claim in a bankruptcy case and not necessarily in determining whether the creditor held a claim under section 101(5) of the Code. The Court thus considers these and other factors potentially relevant to the issues of notice and due process under *Mullane* below in Part III.C.

For purposes of section 101(5) of the Code, this Court not only is bound to follow the conduct test used by the Fourth Circuit in *Grady* and *Holcombe*, but it also agrees with the Fourth Circuit's reasoning and general application of that test in light of the underlying objectives of the Code. Under the conduct test, as adopted by the Fourth Circuit, "[a] claim arises upon exposure, not manifestation." *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 424 (Bankr. D. Md. 2007) (relying on *Grady* for this standard) (citations omitted); *see also Holcombe*, 369 Fed. App'x at 428; *In re Jason Pharm., Inc.*, 224 B.R. 315 (Bankr. D. Md. 1998). As a result, the Reibie Defendants' claims arose prepetition, at the time of Mr. Reibie's alleged asbestos exposure.

## 2. The Distinction Between the Existence and the Enforceability of the Alleged Claims

Despite this straightforward application of the conduct test, the Reibie Defendants argue that the facts surrounding their claims warrant a different conclusion. The Reibie Defendants assert

that their claims did not exist at the time of the Debtors' chapter 11 cases because Pennsylvania did not then recognize such a claim against a former employer for occupational diseases under the Pennsylvania Workers Compensation Act ("WCA"). *See* Defendant's Memo. in Support at 2–3. The Reibie Defendants contend that they did not have claims until 2013 when the Supreme Court of Pennsylvania recognized that individuals may assert claims against their former employers under the Pennsylvania tort system, even if those claims arose more than 300 weeks after employment. *See id. citing Tooey v. A.K. Steel Corp.*, 81 A.3d 851 (Pa. 2013).

The Reibie Defendants' argument fails to acknowledge an important distinction between the existence of a claim and the enforcement of, or recovery on, a claim. At the time of the Debtors' chapter 11 cases, assuming that the Reibie Defendants' interpretation of Pennsylvania law is correct,[9] the Reibie Defendants held claims against the Plaintiff, although such claims were arguably time-barred by the WCA. The Supreme Court directly addressed this kind of contention in *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1412 (2017). In *Midland*, the Supreme Court observed that "[t]he word 'enforceable' does not appear in the Code's definition of 'claim.'"

---

[9] The Reibie Defendants assert that they could not have pursued their claims under either the WCA or Pennsylvania common law at the time of the bankruptcy. As noted, this argument conflates existence with enforcement of a claim. It also suggests an interpretation of Pennsylvania law that is perhaps subject to dispute. For example, in *Tooey*, the court acknowledged prior case law holding that tort claims could be pursued under the common law notwithstanding the WCA. *See Tooey*, 81 A.3d at 861–862 ("In accordance with our decisions in *Boniecke* and *Greer*, we would hold that an employee's common law action is not barred by the exclusivity provisions of either the WCA or the ODA until there has been a final determination that the injury or disease in question is cognizable under either Act. *See Boniecke; Greer.* Thus, in the present case, if it is determined that decedent's nodular lymphoma is compensable, then Pollard's common law action is barred. Conversely, if the facts do not warrant such a finding, her common law cause of action may be maintained.") (internal citations and quotations omitted); *see also See Greer v. United States Steel Corp.*, 380 A.2d 1221, 1222 (Pa. Super. Ct. 1977) (stating that recovery under common law would not be barred if recovery was unavailable under the WCA); *Lord Corp. v. Pollard*, 695 A.2d 767, 769 (Pa. Super. Ct. 1997) (holding that granting of demurrer was premature where there had been no determination of compensability under the WCA and the Occupational Disease Act ("ODA") because if the injury was not compensable under the WCA or the ODA, the claimant could pursue a common law claim). In addition, several lower courts in Pennsylvania have distinguished enforcement of a claim under the WCA from access to the courts. *See Sedlacek v. A.O. Smith Corp.*, 990 A.2d 801, 811 (Pa. Super. Ct. 2010) (stating that although the plaintiff's common law tort action for his mesothelioma had been abolished by the WCA, and his claim was time-barred under the WCA, the WCA did not deny access to the courts, it limited the plaintiff's ability to recover for his claim); *see also Ranalli v. Rohm & Haas Co.*, 983 A.2d 732 (Pa. Super. 2002) (stating that although the application of the WCA may render a claim non-compensable, "application of the provisions of the [WCA] does not deny access to the courts, rather it limits recovery as contemplated by the legislative scheme.").

*Id.* The Supreme Court further explained that the Code contemplates unenforceable claims being within the scope of the section 101(5) definition of claim, as section 502(b) of the Code contemplates unenforceability as a defense to the allowance of a claim. *Id.* ("It is still more difficult to square Johnson's interpretation with other provisions of the Bankruptcy Code. Section 502(b)(1) of the Code, for example, says that, if a 'claim' is 'unenforceable,' it will be disallowed."). The Supreme Court ultimately determined that a time-barred claim under the Federal Debt Collection Practices Act ("FDCPA") was still a claim for purposes of section 101(5) of the Code. *Id.*[10]

The Reibie Defendants' claims existed at the time of the Debtor's chapter 11 cases. Those claims either were covered and barred by the WCA (similar to the creditor's FDCPA claim in *Midland*), or those claims were cognizable under Pennsylvania common law. Under either interpretation of Pennsylvania law at the time of the Debtors' bankruptcy, the Reibie Defendants held claims against the Plaintiff within the meaning of section 101(5) of the Code. As discussed below, that conclusion does not, however, end the inquiry. The Court must further evaluate the scope of the discharge injunction and whether the Reibie Defendants had adequate notice and an opportunity to be heard on their alleged claims against the Plaintiff.

### B. Scope of the Discharge Injunction

Chapter 11 of the Code is intended to identify and resolve a debtor's prepetition liabilities and potential financial barriers in the context of a confirmed plan. A debtors' plan details, among other things, how claims and interests are to be treated postconfirmation and essentially forms a new contract between the debtor and its creditors. If the court confirms the debtor's plan under

---

[10] *See also In re Johns-Manville Corp.*, 552 B.R. 221, 231–32 (Bankr. S.D.N.Y. 2016) ("A claim is contingent where 'the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event.' In other words, the debtor's liability is not yet established. In determining whether a claim exists for purposes of the Bankruptcy Code, it has been said that 'a "claim" can exist under the Code before a right to payment exists under state law.'") (citations omitted); *In re Quigley Co., Inc.*, 383 B.R. 19, 27 (Bankr. S.D.N.Y. 2008) ("Here, too, an Asbestos PI Claimant's pre-petition exposure to asbestos gave rise to a 'claim,' regardless of whether the law of any particular state renders the cause of action unenforceable until some future contingency occurs.").

section 1129 of the Code, creditors are bound by the terms of the plan, whether or not they voted

in favor of the plan and, in many instances, whether or not they filed a proof of claim in the case.

11 U.S.C. §§ 1129, 1141. Specifically, section 1141(d) of the Code provides,

> (d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
>> (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—
>>> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
>>> (ii) such claim is allowed under section 502 of this title; or
>>> (iii) the holder of such claim has accepted the plan ....

11 U.S.C. § 1141(d).

Section 1141(d), in conjunction with section 524 of the Code[11] and the terms of a debtor's

confirmed plan,[12] implement the bankruptcy discharge. This discharge is a key feature of the

bankruptcy system, and it is intended to give the debtor a "fresh start" following the bankruptcy

case. As the Fourth Circuit has stated:

> The "principal purpose" of bankruptcy is straightforward: "to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007) (quoting *Grogan v. Garner,* 498 U.S. 279, 286, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). To this end, successful completion of the reorganization process allows a debtor, burdened with "'the weight of oppressive indebtedness,'" to restructure its financial obligations, discharge its pre-existing debt, and emerge from bankruptcy with a new capital structure that better reflects financial reality.

---

[11] Section 524(a) of the Code provides, in relevant part,
> (a) A discharge in a case under this title--
> …
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; ….

11 U.S.C. § 524(a)(2).

[12] The Debtors' Plan and the Confirmation Order provide, in relevant part, that "each holder…of a Claim…shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the [ ] Code." Case No. 01-64463, ECF 1095, 1274.

*Bosiger v. U.S. Airways*, 510 F.3d 442, 448 (4th Cir. 2007). Courts, including the Fourth Circuit, acknowledge that the fresh start principle does not override all other considerations, but it is instructive in helping courts determine the balancing of a debtor's and creditors' rights.

In this proceeding, neither party disputes that (i) the Reibie Defendants' claims were not listed on the Debtors' bankruptcy schedules, (ii) the Reibie Defendants did not receive notice of the Debtors' chapter 11 cases, and (iii) the Reibie Defendants neither voted on the Plan nor filed a proof of claim in the case. Case No. 01-64463, ECF 362, 976, 3107; *see also* Case No. 19-00199, Pl. Memo. ECF 13, Ex. A ¶ 60; Stipulation of Facts, ECF 13, Ex. B. ¶¶ 44–46; Record Hrg. at 1:53 p.m. The language of sections 524 and 1141 does speak to notice issues; rather, the statutory discharge is focused solely on the concepts of "claim"[13] and "debt."[14] Consequently, unless otherwise provided in the Code, the debtor's plan, or the confirmation order, the bankruptcy discharge creates an injunction applicable to prepetition claims and debt. As discussed above, the Reibie Defendants' claims qualify as prepetition claims in the Debtors' chapter 11 cases and, in turn, those claims and the related debt technically are subject to the discharge entered in the Debtor's cases.

That said, even if a creditor's claim falls within the kinds of claims discharged in a bankruptcy case, the Court still must consider notice and due process issues. Indeed, a violation of a creditor's due process rights may preclude application of the discharge to the creditor's claims. The Court further explores issues of notice and due process below.

---

[13] As referenced above, the term "claim" means a "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5).

[14] The term "debt" means a "liability on a claim." 11 U.S.C. § 101(12).

### C.  The Reibie Defendants' Claims and Due Process Rights

The discharge provisions of the Code, the Plan, and the Confirmation Order all presume that affected parties received adequate notice and due process in accordance with the Due Process Clause of the U.S. Constitution and applicable non-bankruptcy law. *See, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."). A debtor's fresh start facilitated by the Code does not eviscerate parties' rights in all instances. A creditor or other party in interest retains the right to have its day in court and to contest the bankruptcy. Indeed, chapter 11 reorganizations would be far easier to implement if a debtor could unilaterally or secretly wipe out its prepetition debt.

Exactly what constitutes adequate notice and due process in a bankruptcy case is a fact-specific analysis. The Court must consider the identity of the affected parties and the knowledge of the parties at the time of the bankruptcy. It further may give "due regard for the practicalities and peculiarities of the case." *Mullane*, 339 U.S. at 314. Although no single rule applies in every instance, the Supreme Court has instructed that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*; *see also Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249–50 (4th Cir. 2007) (noting no bright line test).

From this basic yet important principle, courts have discerned a meaningful difference between known and unknown litigants when considering due process issues. "In this regard, to achieve a constitutionally permissible discharge of a known creditor's claim against a debtor,

actual notice of the bankruptcy filing and applicable bar date is required. By contrast, where a creditor is unknown to the debtor, constructive notice—typically in the form of publication—is generally sufficient to pass constitutional muster." *J.A. Jones*, 492 F.3d at 249–50 (citations and footnotes omitted). The Fourth Circuit in *J.A. Jones* further defined an "unknown" creditor as "a claimant whose identity or claim is wholly conjectural or 'whose interests or whereabouts could not with due diligence be ascertained' by the debtor." *Id.* (citations and footnotes omitted).

The Plaintiff argues that, as an unknown creditor, the Reibie Defendants received adequate notice of the bankruptcy case and the Bar Date through the publication notice of the Bar Date on December 14, 2001. Pl. Memo. ECF 13, Ex. A ¶ 16. The Plaintiff further contends that it notified all creditors known to it at the time of the bankruptcy, referencing the fact that it was not aware of any potential liabilities for asbestos or asbestos-related claims. Pl. Memo. ECF 13, Ex. A ¶ 53. To bolster this argument, the Plaintiff points out that it was never notified of any potential asbestos claims prior to the 2018 litigation filed by the Reibie Defendants; that it does not produce, manufacture, or distribute products that might contain asbestos; and that it had no information available to it disclosing this kind of potential liability at the time of the bankruptcy. Pl. Memo. ECF 13, Ex. A ¶¶ 53–57. The Plaintiff also notes that, contrary to its knowledge in 2001, Mr. Reibie had knowledge of his asbestosis and filed litigation against certain parties in 1996 for those alleged injuries. Pl. Memo. ECF 13, Ex. A ¶ 52; Def. Memo. ECF 11, Ex. C at 105–106. Mr. Reibie did not name the Plaintiff as a defendant in that litigation or otherwise notify the Plaintiff of any potential liabilities associated with that litigation.[15] *Id.*

---

[15] The parties did not make much of the 1996 litigation, but it may suggest that Mr. Reibie's injuries had in fact manifested in some form by the time of the Plaintiff's chapter 11 case. Because manifestation is not determinative for purposes of whether the Reibie Defendants held claims under section 101 of the Code, the Court does not address that potential issue further.

In its response to the Plaintiff's motion, the Reibie Defendants argue that publication notice is not sufficient notice for unknown creditors. Moreover, at the January 9, 2020, hearing, counsel for the Reibie Defendants suggested that the Plaintiff failed to perform reasonable due diligence to identify the existence of Mr. Reibie's potential claim. He posited that the Plaintiff could have reviewed the records of the Plaintiff's predecessor and notified all former employees of the bankruptcy case and the Bar Date. The Court understands the Reibie Defendants' arguments and fully encourages thorough due diligence in the context of identifying creditors subject to a debtor's bankruptcy case. Notably, such an approach benefits a debtor because it helps ensure that the debtor receives the maximum benefit of the bankruptcy discharge and its coveted fresh start. The question for the Court is not, however, whether the Plaintiff could have taken some conceivable measure to identify Mr. Reibie as a potential claimant. The question, as articulated by the Fourth Circuit, is whether "the debtor can uncover the identity of that creditor through 'reasonably diligent efforts.' *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4 ... (1983)." *J.A. Jones*, 492 F.3d at 250. Moreover, the Supreme Court in *Mennonite Board of Missions* stated that "extraordinary efforts" are not required to meet this diligence standard. 462 U.S. at 798, n. 4.[16]

The record before the Court shows that Mr. Reibie worked primarily for a predecessor of the Plaintiff. Def. Memo. ECF 11, Ex. F.[17] The deposition of the Plaintiff's representative

---

[16] The Supreme Court stated, "We do not suggest, however, that a governmental body is required to undertake extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record." *Id*; *see also Mullane*, 339 U.S. at 317–18 ("We recognize the practical difficulties and costs that would be attendant on frequent investigations into the status of great numbers of beneficiaries, many of whose interests in the common fund are so remote as to be ephemeral; and we have no doubt that such impracticable and extended searches are not required in the name of due process."); *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988) ("As the Court indicated in *Mennonite*, all that the executor or executrix need do is make 'reasonably diligent efforts,' 462 U.S., at 798, n. 4, 103 S.Ct., at 2711, n. 4, to uncover the identities of creditors. For creditors who are not 'reasonably ascertainable,' publication notice can suffice. Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice. Here, as in *Mullane*, it is reasonable to dispense with actual notice to those with mere 'conjectural' claims. 339 U.S., at 317, 70 S.Ct., at 659.").

[17] In the original Memorandum Opinion, the Court stated that Mr. Reibie did not work for the Plaintiff. ECF 34. The Defendants' counsel subsequently clarified that Mr. Reibie was employed for a brief period by the Plaintiff. ECF 43, note 4 and Exs. B–C. The Court appreciates this clarification. Although the clarification does not affect this decision, the Court found it appropriate to acknowledge this asserted fact. The Court observes that the years during which

submitted by the Reibie Defendants also indicates that the Plaintiff could not confirm Mr. Reibie's

employment or much concerning the operations of Mr. Reibie's apparent former employer because

the Plaintiff did not have access to its predecessor's records for the relevant time periods. Def.

Memo. ECF 11, Ex G.[18] Although the Reibie Defendants' counsel suggested that the Plaintiff

should have maintained those records, he produced no evidence or applicable law[19] supporting his

contentions concerning document retention in the kinds of transactions that preceded the Plaintiff's

---

Mr. Reibie was working as an electrician appear to overlap with the formation of the Plaintiff. The Court amends this Memorandum Opinion solely to clarify this aspect of the record. This fact was not overtly challenged. *See, e.g.,* ECF 13, Ex. B. This fact also was not material or dispositive to the Court's analysis. That analysis focused on the Plaintiff's knowledge regarding potential claims and its efforts to identify potential claimants during its chapter 11 case. Thus, the change made by this Amended Memorandum Opinion does not alter the Court's analysis or ultimate decision. The Reibie Defendants' explanation of Mr. Reibie's employment history is detailed at ECF 43, note 4, and Mr. Reibie's deposition testimony described it as follows:

> Q. Of all of the electrical contractors that you worked for in the 1954 to 1974 time period, who did you work for the most?
>
> A. I think it ended up as Comstock, probably. Because the started Patterson Emerson Comstock, and then
>
> Q. So the company changed names multiple times throughout your tenure as an electrician?
>
> A. It did, yeah. Yeah. And then Emerson – I can't remember – I wasn't there all the time. I started with PEC.

ECF 11, Ex. F at 912–13.

[18] The deposition testimony of Gene Cellini states the following:

> Q. And do you have any reason to doubt that Mr. Reibie was a employee of Patterson Emmerson Comstock?
>
> A. I have no information to support that he was or wasn't.
>
> Q. Same question, in relation to Consolidated Comstock?
>
> A. Same answer. I have no information that he worked for that entity or did not work for that entity.
>
> Q. Same question in relation to L.K. Comstock and company?
>
> A. I will repeat the answer, I have no information that supports the fact that he worked for L.K. Comstock or didn't work for L.K. Comstock.

*Id.* at 36. Mr. Cellini further testified:

> Q. What is the policy currently?
>
> A. We have a policy to maintain records pursuant to scheduling of, the discipline and the number of years to keep the record.
>
> Q. Do you know what would have happened to documents of Patterson Emmerson Comstock from, you know, the '50s and '60s, what would have happened to those documents?
>
> A. No. My understanding, when I joined the company in '85, my understanding at that time, and still currently, is a lot of the job-related files and drawings were maintained locally, at the local offices. And then when those local offices through attrition of the people and/or transactions that have occurred, those records wind up, you know, not being available. They're either disposed of them or they're not kept.

*Id.* at 37–38.

[19] State law generally governs document retention issues for business entities incorporated in that state. These requirements may vary state by state. *See, e.g.,* N.Y. BUS. CORP. LAW § 624(a) (imposing some recordkeeping requirements on New York businesses); DEL CODE. ANN. tit. 8 § 224 (Delaware corporate law requires a corporation to keep records on partly paid shares, transfer of corporate shares of stock, and voting rights and trusts); DEL CODE. ANN. tit. 8 § 109 (A corporation may self-impose other requirements relating to its records through its bylaws so long as they do not impede statutory requirements). As noted above, the Defendants did not provide factual or legal support for their document retention claims.

ownership of certain assets or companies.[20] The Reibie Defendants likewise produced no evidence of intentional or wrongful conduct in connection with document retention. The deposition testimony provided by the Reibie Defendants aligns with the Plaintiff's position that it had no knowledge of Mr. Reibie, his potential claims, or any events giving rise to potential asbestos liabilities.

Considering the Supreme Court's and Fourth Circuit's guidance that a party such as the Plaintiff use reasonable diligence under the practicalities and circumstances of the particular case to identify litigants, the Court determines that the Plaintiff's efforts in its chapter 11 case met this standard.[21] The Plaintiff had no information to suggest that Mr. Reibie worked for a predecessor or might hold a claim against it at the time of the bankruptcy case. The record does not contain evidence of red flags or factors that would have alerted the Plaintiff of potential asbestos liabilities. *See, e.g.,* Pl. Memo. ECF 13, Ex. A ¶¶ 53–63. Although Mr. Reibie might have known about his claims in 1996, the Plaintiff did not and had no reason, based on the record, to suspect such claims. The Reibie Defendants thus were unknown creditors at the time of the bankruptcy.

---

[20] *See, e.g., Hall v. Washington Metro. Area Transit Auth.,* 33 F. Supp. 3d 630, 632 (D. Md. 2014) ("If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of only a 'scintilla of evidence' is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*").

[21] The Court notes that it would reach the same conclusion under the multi-factor test articulated by the Third Circuit in *Grossman's. Grossman's,* 607 F.3d at 127–28; *see also supra* Part III.A. For example, the following factors weigh in favor of granting the Plaintiff's motion for summary judgment: the significant time that elapsed between Mr. Reibie's alleged asbestos exposure and employment primarily by a predecessor of the Plaintiff (ending in 1974) and the filing of the Plaintiff's bankruptcy case in 2001; the filing of asbestos-related litigation by Mr. Reibie in 1996 and the Plaintiff's lack of notice of this litigation or Mr. Reibie's existence generally; the fact that the Reibie Defendants' claims are prepetition claims against the Plaintiff under section 101 of the Code (*see supra* Part III.A); the Plaintiff's due diligence in the claims process and noticing of the Bar Date; the lapse of time between the confirmation of the Debtors' Plan in 2002 and the filing of the Reibie Defendants' litigation against the Plaintiff in 2018; the fact that the Plaintiff did not produce, manufacture, or distribute products containing asbestos; and the fact that the Plaintiff's lack of knowledge of any potential asbestos liabilities at the time of the bankruptcy precluded the need for, or ability to appoint, a futures claim representative. *See, e.g.,* ECF 13, Ex. A ¶¶ 53–63; Stipulation of Facts, ECF 13, Ex. B. ¶¶ 42–46; Record Hrg. at 1:53 p.m.

Contrary to the Reibie Defendants' position, courts have recognized publication notice as sufficient notice and due process for unknown creditors.[22] *See, e.g., Russell v. Bean (In re Provident Hosp., Inc.)*, 122 B.R. 683, 684 (D. Md. 1990), *aff'd sub nom. Bean v. Russell*, 943 F.2d 48 (4th Cir. 1991), and *aff'd*, 943 F.2d 49 (4th Cir. 1991);[23] *Placid Oil Co. v. Williams (In re Placid Oil Co.)*, 463 B.R. 803, 816–17 (Bankr. N.D. Tex. 2012), *subsequently aff'd*, 753 F.3d 151 (5th Cir. 2014).[24] The Reibie Defendants try to distinguish themselves as either contingent or non-existent creditors at the time of the bankruptcy, but those arguments fail for the reasons set forth in Part III.A above. Bankruptcy contemplates contingent liabilities as claims subject to a bankruptcy case. Congress made the difficult decision to balance the rights of a debtor and creditors in this manner, eliminating the claims of some creditors in favor of the debtor's rehabilitation, which might benefit many parties (e.g., employees, suppliers, creditors,

---

[22] The Court notes that the publication notice in this case was published in the national edition of the *Wall Street Journal*. Pl. Memo. ECF 13, Ex. A ¶ 16. Although additional or more local publication may have been preferable, the publication choice accords with applicable cases based on the Debtors' knowledge at the time of the bankruptcy concerning the kinds of potential claims that might be asserted against them. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 348–49 (3rd Cir. 1995), *cert. denied*, 517 U.S. 1137 (1996) (holding that publication in national newspapers was sufficient to satisfy notice requirements for unknown creditors); *see also In re Best Products Co., Inc.*, 140 B.R. 353, 358 (Bankr. S.D.N.Y. 1992) (finding it impracticable "to expect a debtor to publish notice in every newspaper a possible unknown creditor may read"). As evidenced by the record, the Plaintiff was not aware of potential unknown tort claimants.

[23] In *Provident Hospital*, the court explained:

> In this case, there is no reasonable possibility that Bean's claim could have been discovered by the Trustee with reasonable diligence as of the time of notification of the final bar date. Bean did not file his arbitration claim until 1987, and, of prime significance in this case, the claim itself did not grow out of any treatment rendered by Provident to Rodney Bean, but to his brother Linwood, who assaulted Rodney. Had Rodney himself been the patient, perhaps some factual issue of reasonable ascertainability would be presented. But here, the ability to perceive Rodney's claim in the wings as of the notification date lay beyond the ken of mere mortals, and due process was satisfied by the constructive notice given to all by publication.

122 B.R. at 694.

[24] In *Placid Oil Co.*, the court explained:

> In general, for unknown creditors whose identities and claims are not reasonably ascertainable, and for creditors who hold only conceivable, conjectural, or speculative claims, constructive notice of the bar date by publication is sufficient. *Id.; Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir.1995), *cert. denied*, 517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996) (toxic tort claimants' due process rights were met through publication notice where "it is well established that, in providing notice to unknown creditors, constructive notice of the bar claims date by publication satisfies the requirements of due process"). Here, Placid published notice of the bar date on three separate occasions in the *Wall Street Journal* and such publication notice was, under the circumstances and facts of this case, sufficient as to the Post–Confirmation Tort Claimants' claims.

463 B.R. at 816–17.

communities, etc.) in various ways.[25] The Court appreciates that this result might seem unfair to the affected creditors. Nevertheless, if constitutional due process concerns are satisfied, there is no justification for this Court to change the legislative balancing struck by Congress.

In light of the record submitted by the parties in connection with the pending motions, the Court determines that the Plaintiff's publication notice of the Bar Date was adequate notice under the circumstances of this proceeding to satisfy the Reibie Defendants' due process rights and subject the Reibie Defendants' claims to discharge in the Debtors' chapter 11 cases.

## IV.    Conclusion

The Court agrees with the parties that the undisputed facts underlying this proceeding support resolution at the dispositive motion stage. Those facts demonstrate that the Reibie Defendants held claims against the Plaintiff under section 101 of the Code, which are subject to the Plaintiff's prior chapter 11 case and the orders entered therein. The Plaintiff's diligence at the time of the bankruptcy was reasonable under the circumstances and did not identify the Reibie Defendants or their potentials claims. The Reibie Defendants' claims are thus barred by the discharge and related injunction under sections 524 and 1141 of the Code, the Plan, and the Confirmation Order. Accordingly, the Court will grant the Plaintiff's motion for summary judgment and deny the Defendants' motion for summary judgment, other than with respect to the requested sanctions. The Court will enter a separate order consistent with this Memorandum Opinion.

---

[25] For example, the legislative history to the Code reveals that "the purpose of a business reorganization case [under chapter 11] . . . is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders" with the understanding that "reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors and stockholders." Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129, 181 (2005) (alterations in original) (quoting H.R. REP. NO. 95-595, at 220 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6179; S. REP. NO. 95-989, at 10 (1978), *reprinted in* U.S.C.C.A.N. 5787, 5796).

cc:     Plaintiff
        Plaintiff's Counsel
        Defendants' Counsel
        U.S. Trustee


**END OF MEMORANDUM OPINION**